Felix v. Spaulding High Sch. Union Dist., No. 411-6-08 Wncv (Crawford, J., Mar. 3, 2010)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT
COUNTY OF WASHINGTON

DEREK FELIX

v.                                                          WASHINGTON SUPERIOR COURT
                                                            DOCKET NO.: 411-6-08 Wncv

SPAULDING HIGH SCHOOL UNION
DISTRICT

DECISION ON DEFENDANT'S FIRST AND SECOND MOTIONS FOR
SUMMARY JUDGMENT

Defendant has filed two motions for summary judgment. The motions address issues of assumption of the risk, municipal immunity, and qualified immunity for municipal employees.[1]

FACTS

For purposes of the motions for summary judgment, the facts are those alleged by the plaintiff since he is the party opposing summary judgment. These facts are supplemented by facts alleged by the defendant which are genuinely uncontroverted. Viewed in this light, the facts are as follows:

Derek Felix grew up in Arizona until the 11th grade when he moved with his parents to Vermont. During the 9th grade, he played football on the freshman team. He did not play during 10th grade because he had been ill with pneumonia during the summer and had moved to a new, larger school district.

In September 2005 Derek's family moved to Barre, Vermont. He enrolled in Spaulding High School and expressed interest in joining the football team. He had already missed the August work-outs. Derek joined the team. His first day of practice was September 15, 2005. He took part in 7 team practices. At least one of the practices involved a tackling drill. He also met with the coaches individually to talk about plays and strategies. There is a dispute about how often these "chalk talks" occurred. Derek recalls a single short talk after a regularly scheduled practice. Felix Depo. Tr. 73. Dennis Hill recalls at least two talks: once in his office at Spaulding High School and once in the chorus room where he used the blackboard. Hill Depo. Tr. 61.

On September 23, 2005, the Spaulding team traveled to Brattleboro for a game. Derek was sent into the game in the final quarter as a defensive safety. The first play in which he participated resulted in a touchdown for the other side. Brattleboro next lined up for a

---

[1] Defendant raised assumption of the risk and municipal immunity in the first summary judgment motion, and qualified immunity in the second. While Plaintiff has requested that the court strike the second motion, Plaintiff has fully briefed both. There is no useful purpose to delaying a ruling on qualified immunity. The motion to strike is denied.

two-point conversion play. When the ball carrier came towards Derek, he lowered his head and tackled the other boy. Derek suffered a catastrophic spinal injury due to "axial loading" of his neck. Both sides attribute the injury to improper tackling technique, specifically tackling with the head down rather than up.

Like other Vermont public high schools, Spaulding is subject to the Vermont Principals' Association Bylaws and Policies concerning athletics. These include a requirement that every student athlete attend 10 practice sessions before competing in an interscholastic event. VPA Bylaws, Article IV, Section 1(I). The parties disagree about whether the "chalk talks" which Derek received individually from his coaches satisfied the 10-practice requirement. It is undisputed that Derek did not participate in 10 conventional team practices before entering the game at Brattleboro. The defendant believes that the 10-practice requirement was met by combining actual practices and the one-on-one "chalk talks."

High school football players at Spaulding and at other schools receive instruction about the danger of tackling with a lowered head in the course of practice and drills and also through a short film about the hazard which is shown to players. Because he started the season after the start of practices, Derek did not see the film. He did take part in tackling drills in the course of practice. His coaches believe that he showed a good understanding of tackling technique. He denies receiving instruction in tackling and states that he was not taught about the danger of tackling with his head down.

ANALYSIS

The motions for summary judgment raise three issues. First, the defendant argues that the coaches can have no liability in this case because the plaintiff assumed the risk of injury under 12 V.S.A. § 1037. Second, the defendant contends that the Spaulding High School District has municipal immunity from suit because high school sports are a governmental function. Third, the defendant argues that the three individuals—the athletic director and the two coaches—have qualified official immunity because they were engaged in a process of discretionary decision-making.

I. Assumption of the risk, 12 V.S.A. § 1037

The history of Vermont's sports injury statute, 12 V.S.A. § 1037, has been explained elsewhere, and does not require any detailed elaboration here. See generally *Frant v. Haystack Group, Inc.*, 162 Vt. 11 (1994). In effect, the statute codifies the common law doctrine of primary, as opposed to secondary, assumption of the risk. *Frant*, 162 Vt. at 17. The difference between the primary and secondary forms of the doctrine, as they relate to this case, can be stated as follows:

Primary assumption of the risk refers to the determination that the allegedly negligent defendant in fact was under no duty to the plaintiff. While a ski resort, for example, owes its skiers the traditional business-invitee duty to maintain the premises free of unreasonable risks, skiing nevertheless inevitably presents certain risks (such as slipping

2

on a patch of ice on the slope) that the ski resort has no duty to prevent. *Sunday v. Stratton Corp.*, 136 Vt. 293, 302 (1978). Those latter risks remain the skiers' responsibility whether the skier is aware of them or oblivious. *Frant*, 162 Vt. at 18 (explaining that the skier is "deemed to consent" to all such hazards). Because the risks are integral to the sport, the resort has no duty to prevent them. Thus, where the plaintiff has primary assumption of the risk, the defendant cannot be negligent and comparative negligence is irrelevant. *Sunday*, 136 Vt. at 301. This is a no-duty formulation of the doctrine.

Primary assumption of the risk does not apply in this case because the defendant does not contend that its coaches have no duty to prevent injury to players. Instead, the defendant claims that the plaintiff played football despite knowing he might become injured. This is the secondary assumption of the risk doctrine. Secondary assumption of the risk is not a defense in Vermont because it falls beyond the scope of section 1037 and is contrary to the comparative fault statute.

The claim of secondary assumption of the risk in this case—that the plaintiff's awareness of the risk of injury in playing football completely bars recovery in spite of any negligence of defendant's employees—is no different in effect from the old rule that contributory negligence created an absolute bar to recovery, a concept essentially made irrelevant by principles of comparative fault.[2] See *id*. at 300 (discussing the similarity of this form of the doctrine with contributory negligence as a complete bar to recovery); D. Dobbs, The Law of Torts § 211, at 539 (2001) (explaining the court routinely conclude that this form of the assumption of the risk doctrine cannot be squared, logically and morally, with comparative negligence). That is, the defendant has a duty, may have been negligent, but the plaintiff nevertheless cannot recover. This is a no-negligence formulation of the rule. The use of assumption of the risk doctrine in this fashion was rejected in *Frant*.

The defendant's argument on this issue reflects misunderstanding of the distinction between these forms of assumption of the risk, and improper reliance on the latter formulation of it. The defendant essentially argues that the plaintiff was generally aware that playing football could result in injury, and did it anyway; thus, they should not be liable. That claim is in the model of the long-rejected form of contributory negligence that is incompatible with comparative negligence, 12 V.S.A. § 1036, and not authorized by the sports injury statute, *id*. § 1037.

The court denies the motion for summary judgment which is based on assumption of the risk.

---

[2] Another principal form of assumption of the risk—that the plaintiff expressly consented to the risk created by the defendant's employees' negligence (a no-duty formulation)—would not be a good fit for this case. Generally, the alleged negligence consists primarily in the alleged failure to properly instruct the plaintiff in the safe tackling technique before putting him in the game, at significant risk of injury if the incorrect tackling technique was used. The defendant does not claim that the plaintiff was aware that defendant's employees had failed to instruct him properly, expressly accepted the risk that the failure to receive that instruction could result in severe injury, and then elected to be put in the game nevertheless.

II.  Municipal Immunity

The issue of municipal immunity is governed by several principles.

First, there is no waiver of immunity except through the purchase of insurance.  29 V.S.A. § 1403.  The Spaulding High School District has chosen to join an intermunicipal risk-sharing association instead of buying liability coverage.  Membership in such an association is specifically excluded from the definition of insurance for purposes of waiver.  24 V.S.A. § 4946.

Second, whether an act by a municipality qualifies for immunity depends on the common law distinction between governmental and proprietary activities.  *Hillerby v. Town of Colchester*, 167 Vt. 270 (1997).  The Vermont Supreme Court has declined to adopt the "private analog" test used to define state sovereign immunity in the case of municipalities.

The question raised by the summary judgment motion is whether a high school football program is a governmental or a proprietary activity.  The common law distinction has its roots in the great increase in public works and services in the nineteenth century.  Roads and water works, in particular, brought benefits to many and injury to a few.   In *Welch v. Village of Rutland*, 56 Vt. 228 (1884), the Vermont Supreme Court expressed the issue in this way:

> The immunity goes a step farther and protects such [municipal] corporations in a total *neglect* to perform certain functions which are concededly for the public benefit and convenience.  No action can be maintained against a municipal corporation by an individual, no matter how great an injury he might be able to show, for the neglect to build sewers or water-works, or for defects or insufficiencies in the plans adopted for these or other public improvements; and this is upon the ground that in such matters the corporation is discharging a legislative or *quasi* judicial function, and its action is not reviewable by the law courts. . . .
>
>           When, however, municipal corporations are not in the exercise of their purely  governmental functions, for the sole and immediate benefit of the public, but are exercising, as corporations, *private franchise* powers and privileges, which belong to them for their immediate corporate benefit, or dealing with property held by them for their corporate advantage, gain or emolument, though enuring ultimately to the benefit of the general public, then they become liable for *negligent* exercise of such powers precisely as are individuals.

*Id*. at 234–35 (emphasis in original).

4

This distinction between direct benefit to the public (immune) and revenue-generating activities which are of only indirect benefit (not immune) has largely survived the efforts of later courts to improve upon it.

*Marshall v. Town of Brattleboro*, 121 Vt. 417 (1960), is the most recent case to focus on the origins and purpose of municipal immunity.[3]  In *Marshall*, the court drew a distinction between the general grant of immunity for the construction of public parks in *Lemieux v. City of St. Albans*, 112 Vt. 512 (1942), and the operation of a ski lift within a public park.  The court declined to rest its decision on the difference between the benefit of an activity to the public generally or to the municipality in its corporate capacity.  The decision described the court's belief that building a park is different from operating a mechanical ski lift.

> The policy that favors the construction of recreational areas by municipalities for its citizens is not so vital to the community, so essential a municipal operation, as to require that immunity from liability for carelessness be conferred willy-nilly on any and all activities the municipality may carry on within the confines of the recreation area.

*Id*. at 425.  This is not whether the public or the mayor's budget benefits immediately from the activity.  Instead, the defining distinction is whether the activity is vital or essential to the community or in some way more tangential and removed from public benefit.

Here the analysis has rested with one exception.  Activities which are specifically authorized by statute are said to be clearly "governmental."  In *Courchesne v. Town of Weathersfield*, 175 Vt. 585 (2003), for example, the sale of sand and gravel from a town-owned pit was held to be governmental in part because of legislation authorizing contracts with third-parties in order to maintain town highways.

In considering whether the operation of a high school football team is governmental or proprietary, the court looks first to the statutory authorization for the activity.  The Spaulding Union High School District was formed in 1987 in order to provide a single high school to serve the districts of Barre City and Barre Town.  16 V.S.A. App., ch. 91.  The district is required by law to provide, furnish, and maintain a high school for its residents.  16 V.S.A. § 822.  The required curriculum is limited to traditional classroom subjects such as reading, writing, and mathematics plus physical education, health, and civics.  A district is not required to offer athletic programs, but obviously all public high schools offer a variety of teams.

---

[3] Subsequent decisions have admitted the shortcomings of the governmental/proprietary distinction but have looked for legislative action to bring change.  See *Hillerby v. Town of Colchester*, 167 Vt. 270 (1997) and *O'Connor v. City of Rutland*, 172 Vt. 570 (2001).  The legislature took action in 1961 in the related area of *state* sovereign immunity when it enacted the Tort Claims Act, 12 V.S.A. § 5601 et seq.  There has been no similar change to the rules of municipal immunity which can still be traced to the principle laid down in the English case of *Russell v. Men of Devon*, 2 Term 667 (1788), that the needs of the public take precedence over the claim of an individual.

The purpose and philosophy of the Barre District's athletic program appears in the school's policy manual. The Athletic Program Philosophy stresses the goals of wide participation by many students, the development of athletic skill and team spirit within the teams, and the promotion of pride and sportsmanship both within the team and the larger community. These philosophies are educational in nature. "Big time" sports issues of revenue, publicity, alumni support, and the stature of the program are absent.

The Barre District has joined with other public and independent school systems to create its own system of governance for sports. These rules appear in the Bylaws and Policies of the Vermont Principals' Association ("VPA"), which were first adopted in 1986. Any district which intends to compete with the other member schools binds itself to compliance with these rules which govern eligibility, schedules of events, practice and rest days, conduct of students and coaches, and specific rules for each sport. The Bylaws include an ethical code for coaches, which emphasizes the educational purpose of high school athletics.

The legal structure and stated purpose of high school athletics in Barre and elsewhere in Vermont clearly identify this activity as *governmental* in nature. The purpose is clearly educational. The rules which the high school accepted when it joined the VPA stress the educational nature of high school athletics. There are few signs of conduct or activities which would define the athletic program as *proprietary*. It is not a side-business like an electrical plant or a telephone company or fiber-optic distribution system which could be said to confer an immediate benefit on the municipal corporation. The beneficiaries of the high school athletic system are the athletes who participate, the other students who attend the games, and the larger community which watches from a distance. The purpose of the program is to benefit the public directly. For these reasons, the district has municipal immunity.

The court's conclusion that high school athletics is a governmental function is consistent with decisions in other states. See *Yanero v. Davis*, 65 S.W.3d 510, 527 (Ky. 2001) (collecting cases); Annotation, *Modern status of doctrine of sovereign immunity as applied to public schools and institutions of higher learning*, 33 A.L.R.3d 703, § 8[e] (1970) (school athletics is governmental in nature); 57 Am.Jur.2d *Municipal, County, School, and State Tort Liability* § 491 (same).

Since the court has concluded that municipal immunity applies to this case, it grants summary judgment to the school district on all claims except those brought pursuant to 24 V.S.A. § 901a.

III. Qualified Official Immunity

The plaintiff has brought suit against three employees of the Barre District. These are the athletic director, Shawn Woods, the football coach, Phillip Joyal, and the assistant coach, Dennis Hill. Pursuant to 24 V.S.A. § 901a(b), claims of negligence against these three individuals have been brought against the Barre District. The plaintiff claims that the two coaches were negligent in failing to make certain that he was sufficiently instructed in

6

how to tackle safely and, more specifically, that he had not participated in 10 practices prior to playing and had never seen the instructional video concerning the danger of tackling head-on. The claim against the athletic director is that he did not supervise Mr. Joyal and Mr. Hill sufficiently to make sure these steps were carried out.

The Vermont law of qualified official immunity is simple in outline. Municipal employees are immune from claims of negligence which occur in the course of their official duties so long as they are acting in good faith *and* their activities are discretionary and not ministerial.[4] An employee who fails in his duty of care while carrying out a ministerial task is subject to suit. Compare *Ferraro v. Earle*, 105 Vt. 243 (1993) (liability present for ministerial tasks) with *Libercent v. Aldrich*, 149 Vt. 76 (1987) (lower level employees immune from tort liability when they perform discretionary acts in good faith).

The two leading cases are *Hudson v. Town of East Montpelier*, 161 Vt. 168 (1993), and *Morway v. Trombly*, 173 Vt. 266 (2001). In both cases, employees involved in road repair (*Hudson*) and snowplowing (*Morway*) were held to be liable (or potentially liable) for highway accidents because their actions—while requiring skill and judgment—did not require the type of discretionary judgment which the qualified immunity doctrine seeks to protect.

In *Hudson*, the court drew attention to the purposes of qualified immunity. These are two: to protect employees who have a duty to exercise discretion in cases in which harm to another person is inevitable (a police officer who must decide whether to make an arrest, for example), and to protect employees who are required to make discretionary judgments about the allocation of public resources or similar policy judgments.

When the present case is considered in the light of these two purposes, it becomes clear that qualified official immunity is not available to the two coaches. First, although coaching decisions may be criticized by spectators and parents of the players, they are not commonly the subject of lawsuits. A coach is not like a police officer or a prosecutor who may be compelled by her legal duty to make a judgment about another person which results in arrest or incarceration with the risk of retaliation through the courts.

Second, the decision of a coach—in this case, to let a new player into the game—is not one which requires a policy determination or a decision about the allocation of public resources. The policy decision has already been made: players must receive appropriate practice and instruction before playing in a game. Defining what constitutes sufficient practice and instruction may be a difficult factual determination for the jury, but it is an inquiry that has a right answer and a wrong answer. It is unlike a policy judgment which requires a balancing of risks and benefits. As the Vermont Supreme Court remarked in *Libercent,* and again in *Hudson*, ministerial decisions are those in which the employee retains no "right to be wrong."[5]

---

[4] The law of official immunity is generally the same for state and municipal employees. The additional category of absolute official immunity is not relevant in this case.
[5] This observation originates in *Williams v. City of Detroit*, 111 N.W.2d 1 (1961).

7

There is no "right to be wrong" about the coaching decision to send a player into a game. It is a decision which requires judgment and attention, but it is not one in which—later— an observer could say that policy considerations such as the player's wishes, the needs of the team, or the events of the game required a discretionary balancing of competing concerns. A player either meets eligibility standards of training and practice or he does not. Because the purpose of the activity is exclusively educational—the very factor which provides immunity to the school district—there can be no balancing of other interests and concerns. The only issue for the coach to decide is whether the student athlete has had enough preparation to play the game. This is not a *discretionary* judgment in the way that the immunity cases make use of the term. The better reasoned out-of-state cases support this conclusion. See, e.g., *Harris v. McCray*, 867 So.2d 188,194 (Miss. 2004) (McRae, J., dissenting) (objecting that the acts of the coach were ministerial because "they did not involve social, economic, or political policy"); *Hacking v. Town of Belmont*, 736 A.2d 1229, 1234 (N.H. 1999) (explaining that the decision of coaches and referees were ministerial because they "did not involve the weighing of competing social, economic, or political factors").

The court makes no judgment about whether Derek Felix was sufficiently prepared to enter the Brattleboro game. That is a factual question for the jury. The parties disagree about whether the 10-practice requirement was met. They also disagree about whether Derek's prior football experience and his apparent skill in the tackling drill support the coaches' decision. These factual disputes do not change the question of whether Derek was qualified to play into a policy-based decision about how to weigh the risks and benefits of letting Derek play. The decision was ministerial.

The claim against the athletic director requires separate consideration. He was not present at the game and played no role in determining whether Derek was eligible to play in the Brattleboro game. The claim against him is that he failed to supervise the coaches so as to ensure that the VPA eligibility requirements would be enforced correctly. On this record, it is difficult to tell what the details of the allegations against the athletic director are. The court allows the plaintiff 10 days to submit a supplemental memorandum which provides a clearer statement of the facts supporting a claim against the athletic director. The defense has 10 days to respond.

CONCLUSION

The first motion for summary judgment is denied with respect to the assumption-of-the-risk defense, and is granted with respect to claims against the Barre School District.

The motion to strike the second summary judgment motion is denied.

The second motion for summary judgment is denied with respect to claims brought pursuant to 24 V.S.A. § 901a(b) for the individual conduct of the two coaches, Joyal and Hill, and is not decided with regard to Woods pending further briefing.

Dated: _____

Geoffrey Crawford,
Superior Court Judge